May it please the Court, Paul Stevenson on behalf of the Appellant Tower Loan of Mississippi, LLC. The issue before the Court is whether there is an agreement to arbitrate. The determinative questions on this appeal revolve around two contracts to which the appellee, Mr. Willis, is a party, each of which contains an agreement to arbitrate. The first contract, the contract on which Mr. Willis based the truth in lending action, which he filed against Tower, which is the underlying complaint and dispute here, this first contract is a loan installment agreement between Mr. Willis as the borrower and Tower as the lender. The second contract is an insurance policy, including the endorsement to the insurance policy. Actually, there are two policies here, but the contract here, the insurance policy endorsement, is between Mr. Willis as the insured and the respective insurance company. Understandably, Tower filed its motion to compel arbitration in response to the Truth in Lending Act complaint challenging disclosures under the loan installment agreement under the arbitration provisions within that agreement. The bankruptcy court, however, erred when the court found there was no meeting of the minds of the parties to that loan installment agreement because of the existence of the insurance policy endorsement. We submit that is error for multiple reasons. The bankruptcy judge found about seven conflicts between the two arbitration agreements. He did. Do you disagree with that, that there's something in that neighborhood? I would say there's more like six, but he found seven. He included differences between the two agreements. He did. Related to the notice period, related to venue, the mutual agreement with the single arbitrator, and costs and fees. He did find differences in conflicts between the agreements. But our threshold position is that he never should have considered the insurance policy endorsement. The question of a meeting of the minds in mutual intent, of course, requires under basic contract principles, when you look at the four corners of the instrument, identification of who the parties to the contract are. And the contract in issue we submitted was the loan installment agreement. Tower is not a party to the insurance policy endorsement. It's named in the insurance policy agreement, isn't it? It is named as an affiliated company in the insurance policy agreement. It is not named as a party. It's named as bound by, right? It is named as within the issue terms on the bankruptcy court's application of subparagraph 2 under the endorsement, which provides that the arbitration agreement also applies to disputes and claims between employees, agents, and affiliated corporations, which would include Tower. But that doesn't make them a party to the agreement. What's the relationship between the insurance companies and Tower Loan? They are affiliated companies. Affiliated in what way? A parent subsidiary. Tower would be the parent within a corporate structure. It's a complicated corporate structure, Your Honor, but you do have the insurance companies. Tower Loan and Mississippi LLC would be the parent, and then there are other parents. Was Willis given the two agreements by Tower? Yes. But the agent, the person employed by Tower is also an agent for the company in this respect, Your Honor. But the point, again, becomes when you look at the insurance policy endorsement, the notice about the policy, it's set forth here and makes it clear this affects your rights. It relates to the policy of the insurance. There in the record of 296, the borrower, the insurer, Mr. Willis, has the right to cancel. If there were no arbitration clause in the loan agreement, would you be able to rely upon the arbitration clause in the insurance agreement to arbitrate this dispute? This is not in our judgment. And the reason is a reasonable reading of this endorsement to the insurance policy. What's occurred here is that the contracting party, the insurance company, the insurer, has entered into this agreement. Now, if there's a dispute that arises under the insurance policy in which the plaintiff insured elects to invoke or involve other entities with respect to related matters, there may be, that situation may arise. But this is a Truth in Lending Act dispute. Plainly, our rights to arbitrate arise under the loan installment agreement. You know, respectfully, the bankruptcy court erred when it equated, if you read the court's opinion, I believe it's on page 17, the court identifies the insurance companies as the parties and then says they include the affiliated companies. That is not an appropriate way to identify the parties to the agreement. Whether a non-contracting party with respect to one agreement has obligations or rights under that agreement, that is not relevant to it. This is of no moment with respect to the meeting of the minds of the parties to the other contract. And so you don't take that subparagraph 2 of the insurance policy endorsement, one, we're not a party, and two, whatever, under whatever hypothetical circumstances, a non-signatory may or may not have rights. That does not bear on the determination of the meeting of the minds between the parties to the loan installment agreement itself. And further, when we look at this, Your Honor, they're not the same parties. That ought to end the discussion in our position. That's a threshold determinative issue. But what you're also confronted with are two separate contracts, admittedly standing alone, valid existing agreements. And the question comes, why do you compare them at all? The court cites the Ragab case. We think that case was incorrectly decided. It's a case first that depends on the parties being the same, and the dissent by Justice Gorsuch is indeed persuasive. But why do you compare them at all? I believe Mr. Willis cites the Munger case and the Protex weatherproofing case to talk about construing the agreements together. But those were global integrated transactions where the court recognized that there was an employment contract containing an arbitration provision which was a condition precedent to all the other agreements. Indeed, it was part of the transaction documents necessary to consummate the transaction. It was integral, and it was part of the consideration. That's not present here. We cited the Massey case to the court where there was an admission agreement to a nursing home, and then there also was an arbitration agreement. And the plaintiff or the individual patient attempted to take the two and compare them together. And the court said, no, don't do that here, because this agreement, this second agreement, was not a condition precedent to the first. This second agreement was not an integral part of the transaction. This second agreement, the arbitration agreement, was not consideration for the admissions agreement on which the plaintiff was attempting to rely. The same thing is true here. This insurance policy endorsement is not a condition precedent to Tower Loan making the loan. The loan installment agreement itself says you don't even have to buy credit life insurance. You do have to obtain property insurance, but you can get that from any credible insurance company that you elect. There's no suggestion whatsoever of any condition precedent relationship at all. At some point you argue ambiguity, do you not? We do in the briefs, and that's in the context of if you reach the issues of construing these agreements, what do you do? If you were to conclude, which we don't think the court should, if you construe them together, apply basic principles of contractual interpretation that say what, as far as, you know, examination of what the court should, harmonize provisions where possible. Determine the dominant intent of the parties where possible. Indeed, finding a contract to be sufficiently definite is favored in the law. And these differences that were identified by the court between the first, the loan installment agreement, arbitration agreement, and the endorsement to the insurance policy are not material. They're not material. How would you have either the district court or this court harmonize contractual agreements that you've acknowledged are in conflict in several respects? Well, what we would submit, Your Honor, is that as Justice Gorsuch recognized in his dissent, there has been an agreement to arbitrate adequately formed. A question of contract formation. And if there's going to be further interpretation in that if you use both agreements, that should be referred to the arbitrator under the delegation clause. In what examination, excuse me. And then what should the arbitrator do? How can those be harmonized? They can be easily harmonized. First, the question of days to respond, 20 days versus 30 days to a notice received, that's hardly of any consequence. It's a reciprocal provision. Hadn't arisen, it won't arise in this case. There's the distinction made as to venue. What do the venue provisions say? Loan installment agreement. Arbitrate in Rankin County or in the borrower's county of residence if the borrower so elects. What does the insurance policy endorsement say? Arbitrate in the borrower's county of residence unless the parties agree otherwise. Harmonizing those, that's really hardly a conflict at all. The selection of the arbitrator by mutual agreement of the parties. If the parties don't agree, one agreement says use Section 5 of the Federal Arbitration Act. When you do so, the court appoints. The other agreement identifies the National Arbitration Forum as the one to appoint the arbitrator, which no longer exists. So there's no material conflict there that deters any form of harmonization with respect to that provision, or costs, or fees, or the carve-out collection provisions within the two agreements. We argue ambiguity in our briefs, but the threshold point, again, basic contract principles require the determination of the meeting of the minds. Whose minds? The parties to the contract. Who are the parties to the contract? Loan installment agreement, it's clear. Borrower and lender. Insurance policy endorsement, it's clear. Borrower insured, an insurance company. And rights of others that may or may not arise do not inform the mutual intent of the contracting parties. Whether other parties may have rights is determined by the contracting parties themselves. What was their mutual intent? The mutual assent was to what proposition? And so we urged the court first to address that determinative issue. That's where the court erred to begin with. The lower court did. Answer the question on contract formation principles as opposed to the use of contract interpretation provisions when you see the courts use interpretation provisions to determine the applicability of one contract to another contract as a part of an integrated transaction. And then here, look at any event at the dominant intent of the parties, and plainly it's undeniable that Mr. Willis intended to arbitrate his disputes. All right. You've saved time for rebuttal, Mr. Stevens. Mr. Koontz. Thank you. May it please the Court, I'm Bryce Koontz. I'm here on behalf of Mr. Chuck Willis. In 2010, the U.S. Supreme Court stated that a court may order arbitration only where it is convinced or ordered that the court satisfied that the parties agreed to arbitrate that dispute. In this particular case, I don't believe that the parties agreed to arbitrate. Well, they clearly are. Globally, both agreements, to me at least, reflect an intent to arbitrate every dispute. Now, the rest of it to me seems to be details that are not material. I mean, you cannot get past the clear intent to arbitrate, it seems to me. That's actually where I believe the facts of this case become really relevant. When Mr. Willis walked into Tower Loan and received this arbitration agreement, he also received a packet of all these other documents that he signed. Included in it was this endorsement, the second arbitration agreement. They were all part and parcel with the same contract. They all came from Tower Loan. My rebuttal to that basic premise that they agreed to arbitrate is it's very challenging to agree to arbitrate when the parties have fundamentally, or one party, the party providing all the documents, Tower Loan, can't fundamentally decide who pays the cost of it. It differs between all the, internally in the first one, and differs from the second arbitration agreement. And so if one party can't decide if it pays all, none, or some of the amounts to pay for arbitration, then that's one of only seven disputes. Why is it that constrained strictly against the person who drafted the agreement? That would be the Tower entities, and your client could pick the one he chooses is most favorable. That's an interesting point because I don't know whether or not my client could, in fact, pick which one to operate under because it would be unclear to him which one is, in fact, binding. They both appear binding, and so to pick one and excuse the other. Why don't you refer it to the arbitrator like the loan agreement says? Arbitrability is a matter for the arbitrator. Let the arbitrator decide. Because in Mississippi, I'm sorry, I apologize if I interrupted you, but in Mississippi, in order for there to be a sufficiently definite contract, it has to be consistent. It has to be overarching. There has to be a meeting of the minds. In here, this is the definition, in my opinion, of a contract that has all these moving parts, but it has so many inconsistencies that it strikes at the heart of an agreement. There's no dispute that the parties agreed to a loan, that there were transfers of funds, whether or not those transfers, in fact, actually happened is the entire premise of the lawsuit, but whether arbitration indeed was presupposed is, I think, more challenging. For example, if the Court were to look at the installment agreement, it's on Record on Appeal 294. At the very bottom of it, it states arbitration agreement. By signing the loan, obtaining this loan, borrower agrees to the arbitration agreement on the additional pages, plural, of this agreement. You should read it carefully before you sign below. Important provisions, including our privacy policy, are contained on additional pages and incorporated herein. Mr. Willis signed directly below that. Now, the additional pages, counsel for Tower Loan explained below that that included not only the arbitration agreement on the back half of that page, which is Record on Appeal 295, but it also included the endorsement to require binding arbitration contained on Record on Appeal 297 and 298. It was all incorporated in one thing. So Mr. Willis, who is, by all accounts, a typical consumer, we have affidavits in the Record on Appeal that he has no legal training. And Mr. Willis looked at all this, and how would you know where to proceed? It's challenging. If you can provide me a recent case that says consumers don't have to arbitrate, that would be one thing, but they're all against you on that. Right. There is an important, and I think it's very important to identify that, if there's an agreement to arbitrate, the consumer is bound to it. I think that's abundantly clear in the case law, and I'm not disputing that. But I think if a consumer is looking at documents that are so ambiguous and so rooted in inconsistency, it's challenging for a consumer to say, oh, I actually agree to this, or I would know how to proceed with this. When a federal judge can look at this and say, I don't know how this is actually going to play out, how do I enforce one and not enforce the other, that's the inconsistency. The other issues that I wanted to discuss, if I may, briefly, is there were some arguments that have been raised today that were, in fact, waived below. First and foremost is Tower Loan not being a party to the second agreement. That was waived. Tower Loan did not argue that. Actually, below, I happened to be there. But below, Tower Loan, in fact, argued that they were a party to it, but it just didn't include this kind of lawsuit. It was included only in the insurance context. That is not a fair reading of the second arbitration agreement. I won't dive into it, but the second arbitration agreement, if I may, calls Tower Loan, it identifies a lender with a capital L, lender. It identifies Tower Loan of Mississippi LLC. It covers, as the scope, any and all claims, which is identical to the language in the other arbitration agreement, the first one, that Tower Loan now wishes to proceed under. Furthermore, the other arguments, the ambiguity analysis that was identified, that Tower Loan says that the bankruptcy court did not properly go through that analysis, that was also not, in fact, argued even to the district court, and thus it is waived here on appeal. But even if not, it's very hard, in my opinion, to harmonize competing provisions. For example, saying Tower Loan pays all of the costs or Tower Loan pays none of the costs, it's challenging under contract interpretation principles, which I will agree to, very challenging to harmonize those things. They just flat conflict. There's no way to find a meeting of the minds as to that point. Furthermore, the severability argument was also not argued below. So those main arguments were waived. Important facts, Tower Loan, I will just identify a few different things. Below, counsel for Tower Loan argued on Record on Appeal 319, it's important to point out that in Tower Loan's motion it has not invoked this, the second arbitration agreement, close quote. It's hard to invoke an arbitration agreement if you're not a party to it, in my opinion. And so that's fascinating that Tower Loan says we're not a party now on appeal, but below they were completely different. Furthermore, the representations were not everything. I think that if you look at the second arbitration agreement, it identifies, it says in paragraph 1, this is on 297, this arbitration agreement applies to all claims and disputes between borrower and the company. This includes, but it is not limited to, all claims and disputes arising out of, in connection with, or relating to, bullet point number one, the loan borrower is obtaining from the lender today, or any other loans or retail installment contracts with the lender. It goes down. Any insurance purchased from the company in connection with the loan or any previous loan or retail installment sales contract. The point is to say that the second arbitration agreement only comes from the insurance context is not a fair reading of it. It obviously intends to include the scope of all agreements. The mental gymnastics, I highlighted this in my brief, to say we're not a party or we are a party, but we're not included as the scope when it's got this broad of language. It's a one-way street of documents that came from Tower Loan. I think it's clearly a contract of adhesion on both of these. I'm sorry, what makes it a contract of adhesion? Because they were provided with no opportunity to, in fact, negotiate any kind of terms. Give me a case that says that. I apologize, Your Honor. I don't have one right here on me. That's a great question. I apologize. I probably should have included that in my brief. I think if this is a contract of adhesion, then just almost any consumer arbitration agreement would be a contract of adhesion, wouldn't it? It may very well be, but I think this is where the Tenth Circuit and the RAGAB decision, in this case, have key important factual distinctions. In RAGAB, for example, it was two parties of relevance to the arbitration dispute. Each had drafted three different arbitration provisions. They disputed in four material ways. And I think it's important that even though one party drafted three of the arbitration agreements, the Tenth Circuit and RAGAB said they didn't actually have a meeting of the minds because they differed so much on terms, even though it was only four disputes. Here, we have two agreements at issue, both produced by the same party, yet they are so internally contradictory, we can't determine basic, basic tenets. In Mississippi, and I've got the case in my brief, I know this, Your Honor, but in Mississippi, price is, in fact, a material point of any contract. And so I've got that in my brief, and I believe that that's a really critical point here. Price could not be determined from the face of the documents. And to say, well, Mr. Willis can choose to elect which arbitration agreement he goes under, my rebuttal to that might be, why couldn't Mr. Willis, in fact, choose to just not arbitrate it because it's so contradictory between them. Also, the number of disputes, it's been identified seven of them. I think riddled is the key phrase for Mississippi Supreme Court. That's from Duke v. Watley and Giglio v. Sia. That key phrase is where it's riddled with inconsistency. It struggles, a court struggles to say that there was actually an agreement formed. That's contract formation. Again, those sites are all in my brief. Tower Loan provided a one-way street of information, and that street differed. It's challenging to say this would be a case to create a split in authority from the Tenth Circuit where multiple arbitration agreements with competing terms, in fact, can be enforced where there was some overarching meeting of the minds. This case, importantly, is distinct from a case where there's a simple one line, the parties agree to arbitrate, and all the terms can be filled in with statutory fillers or others. Simplicity allows for an easier meeting of the minds. Here, there was no meeting of the minds. It was so complex that even now, even though Tower Loan produced all of it, we can't figure it out. I, uh, bear with me. One thing about the dissent in RAGAB, if I may. It was brought up by opposing counsel, and it was discussed at length in the bankruptcy court's opinion. I think it's important because Justice Gorsuch is now on the U.S. Supreme Court. In it, and I will quote, he said the following, because the plaintiff asked for and received assent to three arbitration clauses he drafted and signed three others, all in a commercial setting and well represented by counsel, I just don't see how he can seriously claim that he never intended to arbitrate. Those are key factual distinctions. Mr. Willis, no legal training, no attorney, and yet, in fact, he didn't have counsel there, and it was not in a commercial setting. It wasn't necessarily in that kind of typical guise. This was a consumer going in to get a standard loan, and, in fact, it was a renewal loan, if memory serves. And so... One thing arbitration was, at least in theory, designed to do was to make it very cost effective for people to resolve their disputes. Yeah. Why is it that there's so much resistance, or the argument is, well, consumers shouldn't have to arbitrate, when that might be a lot cheaper for the consumer and faster in the long run? Why is there this, why is there, you characterize it as a contract of adhesion. I don't understand that argument in the face of the intent of arbitration clauses. Wonderful. Your Honor, I'll try to answer that with two ways, two distinct subparts, if I may. The first is I think there's a general aversion in the consumer world, and it's difficult standing at this podium to represent all consumers by any means, but I will say that there's an aversion to going to an arbitrator that gets paid on a per-arbitration basis. And so if I go to an arbitrator, and that arbitrator has 100 cases with Tower Loan, and they rule in my favor, and Tower Loan has the option to select that arbitrator down the road, what's better from a business standpoint? Clearly, it's better for them to have more cases that come through from Tower Loan, where they rule in their favor because that's more money in their pocket as an arbitrator. That's just one. The other issue that I see with arbitration here is that arbitration can provide, I think there's, it can be efficient, but if you look at the installment loan agreement, and if you don't mind, again, this is Record on Appeal 294, it says, this is under remedies, it's down in the fine print, when borrower defaults, lender can take one or more of the following actions. Cancel the insurance in accordance with the arbitration agreement, bring suit for or arbitrate the delinquent payments, accelerate, et cetera. It says that the borrower, lender may hire or pay an attorney to help collect the note or to recover its collateral if debtor does not pay or if debtor files bankruptcy. Debtor will reimburse lender for these costs. This includes lender's attorney's fees and lender's legal expenses, whether or not there's a lawsuit. So what happens is, is I go to arbitration, even after I've filed bankruptcy, an arbitrator who's totally unaware of the fact that I've gotten a bankruptcy discharge, in fact, says, well, this says I can award attorney's fees, not only Tower Loan because I have 100 with you, am I going to let you win in this particular matter, but I'm also going to award you attorney's fees, bankruptcy discharged or not? And I think that is a concern. It's a genuine concern, especially in the bankruptcy context. I hope that answers your question, Your Honor. Suppose that, I know that this isn't the result that you want and I don't know what result we're going to reach, but suppose we say that if nothing else, there was definitely an agreement to arbitrate, regardless of what the terms were. Assume that we were to decide that. Do you agree that it would then go to the arbitrator to reconcile or harmonize or figure out what terms should be imposed as between the two contracts, or is that a job for the courts? I believe both the first and the second arbitration agreements in this particular matter specifically state that the arbitrator will decide those kinds of questions. That seems to me to be the correct result. Right. It's one of the few consistent provisions, if I may. I think that stating that parties agree to arbitrate generally, when in fact so many of these different terms differ, is very challenging. To ask a federal court, for example, below the bankruptcy court or the district court, to enforce an arbitration provision when Tower Loan has said they're only proceeding under the first. They're not proceeding under the second arbitration agreement. That puts whatever agreement that the parties had at odds because they differ on notice periods, who decides the arbitrator, venue, costs, all these different things differ. And so to say, Mr. Willis, you may bring your claim, but you need to go to an arbitrator below. Here's the way to do it. I think it puts courts below, frankly, in a tough position to say, all right, go arbitrate, where to arbitrate, who knows, but good luck. I don't even have jurisdiction to hear after that happens. It's challenging in cases like this. And so, Your Honor, that's where I think the problem would come out of a case like this. Another point, if I may, and I think I'll keep it brief and then I'll be done, is the delegation clause was argued extensively in the briefs, specifically that the first arbitration agreement contained a delegation clause that said any and all claims has to be arbitrated under that arbitration provision. The second, and this is important, the second arbitration agreement contains almost verbatim the exact same delegation clause. So even though that argument was waived below, Your Honors, I would propose that, in fact, on the merits, that argument fails. Lastly, attempting to harmonize provisions that are fundamentally competing is very, very challenging. And I think asking, I think Judge Olak had it correct when he reviewed the Ragab v. Howard case. It's the only case, as far as I'm aware, from the circuit level that identifies this very issue. And even with Justice Gorsuch's dissent, I believe the reasoning is that very case that he identifies. If I may, Justice Gorsuch says that all this is not to say that I believe conflicting contract provisions might never render an arbitration agreement void for lack of meeting of the minds. In some cases, for example, the parties' contract documents will conflict on the fundamental question whether they wish to arbitrate or not. I don't know what other kind of case where we have so many competing provisions that are riddled with inconsistencies than this, where it just doesn't make sense that they actually agreed to arbitrate. These were not represented parties. At least Mr. Willis was not represented. He's a consumer. And so I would ask this Court to affirm what happened below. And I would ask that the Court take into consideration that, while there can be a simple meeting of the minds, there can be a simple one line, we agree to arbitrate, and Tower Loan provided both these documents. Tower Loan could have elected to do that. But instead, Tower Loan had broad, inconsistent, and vague clauses, so much so that it was riddled. And under Mississippi law, that kind of contract ought not to be, in fact, enforceable because there's no meeting of the minds. And so with that, pending any questions, I appreciate your time. Thank you. All right. Thank you, Mr. Koontz. Mr. Stevenson for rebuttal. Thank you, Your Honor. Several points quickly. One, there shouldn't be any confusion or uncertainty around the very basic proposition that Tower Loan is not an insurance company. We are not the insurer. And suggestions that Tower Loan wrote the insurance policy are not evidenced by the record in any way whatsoever. The insurance companies are regulated by the Department of Insurance. And what the Exhibit 1 that's identified, or excuse me, Exhibit 2 in the lower court, at the record 296, this notice about the policy of insurance, is one plainly directed on behalf of the insurance company to the insurer talking about you and the insurance company. That's how this arises as it relates to the insurance policy and the endorsement itself. There were references made by counsel to the provision in the loan installment agreement concerning additional pages. If I may, I'd like to address that briefly. If you look at the record on page 294 in the loan installment agreement, the document provides arbitration agreement. By signing below and obtaining this loan, borrower agrees to the arbitration agreement on the additional pages. Arbitration agreement in the singular. Next sentence. You should read it carefully. And references are made to the statements of counsel in the lower court. There shouldn't be any confusion about counsel's position on his feet at the hearing, which I will explain momentarily, concerning he took the position there were two different agreements, and the only one that applied was the loan installment agreement. Questions as to waiver. First and foremost, he says Tower Loan waived the issue as to who were parties. The bankruptcy court, in its opinion, record page 252 states in the lower court now because Tower Loan asserted that the arbitration agreements govern separate issues and or parties. So there's that recognition by the court there. And then we would emphasize how this proceeding has evolved. Complaint is filed. Truth in lending action. Motion to dismiss, to compel arbitration filed based on that complaint under the loan installment agreement. It's a valid agreement. There's a valid delegation clause. Response in writing. Oh, no, I didn't know I was going to arbitrate. I never agreed to arbitrate. Or there's unconscionability. That was it. Let's just walk through how all this would work in your view. In your view, we would vacate the district court's judgment and direct that there be arbitration. Is that the first step? Yes, sir. All right. Then how are the parties going to choose the arbitrators? They'll do it pursuant to the agreement, by mutual agreement. Well, don't they have to harmonize something in your view? Both agreements provide for a single arbitrator to be mutually agreed to by the parties. If they don't agree, one says you go under the FAA. The other says you go to the National Arbitration Forum, which does not exist. So there is no conflict there. The court could do it, or this court could direct that the party submit three names to the bankruptcy court, and the bankruptcy court pick the arbitrator, or the bankruptcy court could identify names. That's not really true if there's a delegation clause and it goes to an arbitrator. I mean, a delegation clause assumes that it goes to an arbitrator that the parties have chosen, but I don't really know how you get over the hurdle of choosing them where there's a conflict. Respectfully, the threshold provisions in both arbitration agreements provide for a single arbitrator to be mutually agreed to by the parties. Second, if there is no agreement. And you've given us that answer. Yes. All right, thank you, Mr. Stevenson. Your case is under submission. Now here, Hayano versus Environmental Safety and Health Consulting.